UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:10-cr-00186-JAW |
| | ) | |
| DOMĪNGÓS NÓBREGA | ) | |

**ORDER ON DEFENDANT'S MOTIONS FOR NEW TRIAL AND NEW SENTENCING**

Domīngós Nóbrega returns to court seeking a new trial and new sentencing based on four arguments—that he is a sovereign man and not subject to the jurisdiction of this Court, that he was deprived of his right to confront his accuser, Norella Meerzon, that certain physical evidence was hidden from the jury, and that the Court should prosecute Ms. Meerzon. The Court previously addressed and rejected these same arguments in somewhat different forms and does so again. Mr. Nóbrega's filings are late and procedurally barred; nevertheless, as Mr. Nóbrega has strenuously urged the Court to address his concerns, the Court has once again done so and denies his motions for post-conviction relief.

**I.   BACKGROUND**

After a two-day trial, on May 24, 2011, a federal jury found Domīngós Nóbrega guilty of being a felon in possession of a firearm. *Jury Verdict Form* (ECF No. 98). Pursuant to the jury verdict, the Court sentenced Mr. Nóbrega on July 13, 2012 to ten years in prison, three years of supervised release, and a $100 special assessment; the Court imposed no fine. *J.* (ECF No. 228). The United States Court

of Appeals for the First Circuit upheld Mr. Nóbrega's conviction on May 20, 2014. *J.* (ECF No. 275) (*First Circuit J.*).

Mr. Nóbrega has filed numerous post-judgment motions. On June 2, 2014, he filed a post-conviction motion with this Court, *Letter From Sir Domīngos Nóbrega* (ECF No. 276) (*Def.'s Mots.*), but also filed an appeal of the First Circuit's denial of his previous appeal. *Notice for Appeal J.* (ECF No. 277). On June 9, 2014, this Court stayed Mr. Nóbrega's post-conviction motion until the First Circuit resolved the appeal. *Order Staying Mot. for Post-Conviction Relief* (ECF No. 278). On June 26, 2014, the First Circuit remanded the matter to this Court. *Order of Court* (ECF No. 280). With the docketing of the appellate court's Order, this Court's stay of the post-conviction motion is lifted and the Court now addresses Mr. Nóbrega's post-conviction motions.

A.  **The Trial Evidence**[1]

Trial testimony revealed that in October 2010, Mr. Nóbrega, a convicted felon, was staying in Bangor, Maine with his girlfriend, Norella Meerzon. During the months before October 2010, Mr. Nóbrega had exchanged emails with a friend named Eric Babilonia. Mr. Babilonia became increasingly concerned about Mr. Nóbrega's emails and he informed Ms. Meerzon about Mr. Nóbrega's apparent instability. On October 23, 2010, Ms. Meerzon went to the Bangor Police, showed them the email correspondence between Mr. Nóbrega and Mr. Babilonia, and based on that correspondence, the Bangor Police set up a tactical team around Mr.

---

[1]  This synopsis of the trial testimony is taken from the Court's November 7, 2011 Order denying Mr. Nóbrega's earlier post-trial motion. *Order on Mot. for New Trial* at 3-7 (ECF No. 157).

Nóbrega's Bangor home. They tried repeatedly, but unsuccessfully, to contact Mr. Nóbrega over the next four hours, and ultimately tear-gassed the Nóbrega residence. Mr. Nóbrega emerged peacefully and was arrested.

During the hours that the tactical team had surrounded the residence, Joel Nadeau, a Bangor Police Detective who had been trained as a sniper, had Mr. Nóbrega under surveillance with a high-powered scope and testified that he saw Mr. Nóbrega hold a semiautomatic weapon. Bangor Police Detective Eric Tall participated in the execution of a search warrant and testified that he found a 9-millimeter Glock pistol underneath the mattress on the bed in the master bedroom. Detective Nadeau testified that the Glock closely resembled the pistol that he observed in Mr. Nóbrega's possession the night before.

In addition to police witnesses, the Government called several other witnesses. First, Mr. Babilonia confirmed that among the other things Mr. Nóbrega had said that caused him concern was that he was "sitting next to his gun," and that he was "locked, cocked and ready to go, pretty much he had his guns, and he was suited up."

Next, the Government called as witnesses a number of friends who visited the Nóbrega-Meerzon residence during the days leading up to October 23, 2010. One was Crystal Schroeder. She arrived at the Bangor home on October 18 or 19 with Jason Rodriguez, Christopher Sherrill, and Justina Cipriano, and a woman named Olga. Ms. Schroeder testified that when she arrived at the Meerzon home, Mr. Nóbrega opened the door and was carrying a black handgun. Ms. Schroeder

3

said that she noticed the same firearm on the nightstand in Ms. Meerzon's and Mr. Nóbrega's bedroom. Finally, she testified that the evening before the New York friends left, when they sat down for dinner, Mr. Nóbrega got dressed up in a black bullet-proof vest, a robe, a shoulder holster, and a gun in the holster. Ms. Schroeder identified Exhibit 6, which was the Glock that Detectives Tall and Nadeau identified, as being the firearm that Mr. Nóbrega had in his holster. Ms. Schroeder said that Mr. Nóbrega described the meal as the "Last Supper" and during the meal, he brought out a Bible and had Ms. Schroeder read a passage about betrayal.

Christopher Sherrill also testified. He arrived in Bangor with Justina Cipriano, Crystal Schroeder, Jason Rodriguez, and Olga. He confirmed that he had seen a handgun in the master bedroom on a nightstand. Mr. Sherrill testified that when he and Justina Cipriano were in one of the bedrooms, Mr. Nóbrega entered wearing a black shoulder holster with a gun. Mr. Sherrill later saw the holster through the white robe Mr. Nóbrega was wearing that evening. He confirmed that Mr. Nóbrega called the dinner the "Last Supper." Mr. Sherrill testified that Mr. Nóbrega told him that he had the gun in order to protect himself from Jason Rodriguez, who he thought was a police officer. Mr. Sherrill identified Exhibit 6 as appearing to be the same firearm that was on the nightstand in the master bedroom.

Justina Cipriano testified. She corroborated Mr. Sherrill's testimony about Mr. Nóbrega coming into their bedroom with a gun and a vest. She also was "pretty

4

sure" he was playing with the firearm, cocking it. Similarly, she identified Exhibit 6 as appearing like the gun Mr. Nóbrega had in the bedroom.

Jason Rodriguez testified. Mr. Rodirguez is a sound technician who met Mr. Nóbrega in the music business in New York, and they had developed a "working relationship." Mr. Rodriguez testified that while they were in New York, Mr. Nóbrega told him he had a gun and that Mr. Rodriguez witnessed one. When Mr. Rodriguez arrived in Maine to visit Ms. Meerzon and Mr. Nóbrega, Mr. Rodriguez did not see Mr. Nóbrega with a firearm, but he confirmed details about the so-called "Last Supper," including Mr. Nóbrega's white robe and Bible readings.

The Government also called April Renee Maness as a witness. She has known Mr. Nóbrega ever since she was 12 or 13 years old. She said that on October 23, 2010, he began texting her about having "some kind of a crisis." He thought his girlfriend was having him followed by the FBI. He told Ms. Maness that "he wasn't going down without a fight and he was packed."

Mr. Nóbrega did not testify. The defense called one witness, an investigator, who provided foundational evidence for the admission of a deed, which confirmed that Ms. Meerzon and Mr. Nóbrega both owned the house where this incident took place, that a number of liens and mortgages had been filed against the premises, and that Ms. Meerzon was suing Mr. Nóbrega civilly.

**B.  Domīngós Nóbrega's Reaction**

Mr. Nóbrega has never accepted the verdict and sentence and has pursued all conceivable avenues of relief, including a currently pending petition to the United States Supreme Court for a writ of certiorari. *See Nobrega v. United States*, No. 13-

5

10581 (filed June 11, 2014). Mr. Nóbrega firmly believes that his conviction and imprisonment are illegal; in fact, he has accused the Court of kidnapping him and holding him hostage. *Def.'s Mots.* at 1. Mr. Nóbrega's anger with the verdict and the sentence rests on four main contentions. *Id.* at 1-4. Despite the fact that these arguments are procedurally barred and too late, the Court will address each because Mr. Nóbrega deserves an explanation to the issues he has raised.

## II. DISCUSSION

### A. Domīngós Nóbrega: Sovereign Man

Mr. Nóbrega describes himself as a "sovereign man" and signs his pleadings "Sir Domīngós Nóbrega."[2] *Id.* at 1. Mr. Nóbrega asserts that he "was a U.S. Serf in 08 but no longer." *Id.* at 4. He says that he is "not a citizen of these United States of America," and after he is released from prison, he is "NOT going to live in the U.S., or receive a U.S. government I.D., work a U.S. job, stay on probation in the U.S., follow your laws, do community Service – I don't care for your community!" *Id.* Upon release from incarceration, Mr. Nóbrega wishes to leave the United States and "go home to my family." *Id.*

Regardless of his citizenship status, while in the United States Mr. Nóbrega was and is subject to its laws, including its criminal laws. *See, e.g., Allah El v. Dist.*

---

[2] Mr. Nóbrega's post-conviction motion states that it is from:

The Sovereign Man Held Hostage by [t]he United States of America Sir Domīngós Nóbrega.

*Def.'s Mots.* at 1. He also uses the term *ens-legis* to describe himself. *Id.* Black's Law Dictionary defines "*ens legis*" as: "A creature of the law; an artificial being as opposed to a natural person. The term describes an entity, such as a corporation, that derives its existence entirely from the law." BLACK'S LAW DICTIONARY, 648 (10th ed. 2014).

6

*Attorney for Bronx Cnty.*, No. 09 CV 8746(GBD), 2009 WL 3756331, at *1 (S.D.N.Y. Nov. 4, 2009) ("Those who have voluntarily relinquished their citizenship, like other aliens, must obey the federal and applicable state laws, just as native-born and naturalized citizens are required to do").[3] According to the Presentence Investigation Report, Mr. Nóbrega was born in Stoughton, Massachusetts and between the ages of 19 and 26 was convicted of twelve crimes, including two felonies: (1) assault with a deadly weapon upon a government officer in 2000, and (2) assault and battery on a police officer in 2002. As such, he was prohibited under federal law from possessing a firearm. 18 U.S.C. § 922(g)(1). On November 18, 2010, listing these two prior convictions, a federal grand jury indicted Mr. Nóbrega for possession of a Glock Model 17, 9mm handgun in violation of § 922(g)(1) in the District of Maine on October 23-24, 2010. *Indictment* (ECF No. 16). After a two day trial, on May 24, 2011, a federal jury found Mr. Nóbrega guilty as charged. *Jury Verdict Form* (ECF No. 98). The Court is aware of no exception to its jurisdiction for individuals like Mr. Nóbrega who maintain that they are sovereign citizens. *See, e.g.*, *Allah El*, 2009 WL 3756331, at *1 ("Petitioner cannot unilaterally bestow sovereign immunity upon himself").

Furthermore, the Court is required to uphold the jury verdict:

[W]ith few exceptions, once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.

---

[3]  The Court expresses no view on whether Mr. Nóbrega has successfully renounced his United States citizenship.

7

*United States v. Powell*, 469 U.S. 57, 67 (1984) (internal citations omitted).

The Court respects Mr. Nóbrega's right to hold strong views about the United States, particularly since he is currently incarcerated in a federal prison; however, the Court is without authority to release an incarcerated inmate simply because that inmate declares himself sovereign and because he rejects this Country in general and this Court's authority specifically.

### B.    Norella Meerzon

On November 7, 2011, the Court addressed Mr. Nóbrega's argument concerning the Government's failure to call Norella Meerzon as a trial witness. *Order on Mot. for New Trial* (ECF No. 157). In that Order, the Court summarized Mr. Nóbrega's perspective:

> Mr. Nobrega strenuously contends that he is actually innocent of the charge, that he did not possess the firearm, and that he was set up by his girlfriend, Norella Meerzon. Mr. Nobrega starts by acknowledging that as of October 2010, he had previously been convicted of a felony and could not possess a firearm. He asserts that his girlfriend, Ms. Meerzon, knew that he was a felon and further knew that he would get in trouble with the law if he possessed a firearm. Nevertheless, he says that Ms. Meerzon bought a 9-millimeter firearm on May 5, 2010, snuck it into their Bangor home, and hid it in the house without his knowledge. In fact, he argues that Ms. Meerzon's purchase of the firearm in Maine was a violation of federal law because she was not a Maine resident at the time, but a resident of New York. Mr. Nobrega asserts that having secreted the firearm inside their Bangor residence, Ms. Meerzon contacted the Bangor Police and falsely reported that Mr. Nobrega was engaging in bizarre behavior and had a firearm, and that this false report led to the standoff and to these charges. Mr. Nobrega is very upset that the Government has not prosecuted Ms. Meerzon for her allegedly illegal actions and instead has taken her side in a scheme to imprison him.
>
> Mr. Nobrega explains the testimony of the lay witnesses at trial by arguing that they are friends of Ms. Meerzon and complicit in her plot. He also says that these friends hauled Ketamine to their house in

8

>   Bangor, that they were taking drugs while they were in Bangor, and that he insisted that Ms. Meerzon make them leave. He maintains that Crystal Schroeder accused Jason Rodriguez of stealing her Ketamine and that Mr. Nobrega's actions at the "Last Supper" reflected his effort to get Mr. Rodriguez to admit his theft.
>
>   Mr. Nobrega believes that Norella Meerzon hatched this scheme in order to win her lawsuit against him and to oust Mr. Nobrega from his joint ownership of their Bangor home. Ms. Meerzon had filed a lawsuit against Mr. Nobrega seeking sole ownership of the Bangor home. Further, a local real estate agency had a lien and a local attorney had a mortgage against the property for debts Ms. Meerzon owed them and Ms. Meerzon therefore had an incentive to jettison Mr. Nobrega's ownership share since her share of the property had been compromised by accumulated debt.

*Id.* at 7-8. Responding to this concern, the Court explained that the reason Ms. Meerzon was not called as a witness—according to the lawyers for the Government and for Mr. Nóbrega—was that she had asserted her Fifth Amendment right to remain silent:

>   Similarly, Mr. Nobrega's overriding and earnestly-pressed contention is that his trial attorney should have called Norella Meerzon as a witness to lay bare her participation in these schemes against him. But at the October 7, 2011 hearing, the parties repeated their earlier belief that, if Ms. Meerzon had been called to testify, she intended to assert her Fifth Amendment right against self-incrimination and that the Government was unwilling to extend immunity to her. *See Def.'s Mot.* in Limine *to Have Ct. Inquire Whether Gov't' Witness Will Invoke Fifth Am. While Testifying* (Docket # 71). If so, Mr. Nobrega's repeated assertion that Ms. Meerzon should have been called as a witness collides with her right to remain silent and may explain trial counsel's strategic decision not to call her. In any event, there is no evidence from which the Court could determine what happened, other than the fact that Ms. Meerzon did not testify either for the Government or for Mr. Nobrega.

*Id.* at 12.

First, Mr. Nóbrega raised this same argument in his appeal to the First Circuit, and the appellate court ruled against him on May 20, 2014. Specifically,

9

the First Circuit rejected Mr. Nóbrega's Confrontation Clause arguments about Norella Meerzon. *First Circuit J.* at 1-2. As this Court is required to apply the teachings of the First Circuit, Mr. Nóbrega cannot be successful in raising with this Court the same arguments that the First Circuit has decided against him.

Next, even if this Court could disagree with the First Circuit, it would not do so. Contrary to Mr. Nóbrega's argument, a criminal defendant does not have the right to be present at a grand jury proceeding and does not have the right to cross-examine witnesses who appear before the grand jury. *E.g.*, *Rehberg v. Paulk*, 132 S. Ct. 1497, 1509 (2012); *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218-19 (1979); *United States v. Johnson*, 319 U.S. 503, 513 (1943). Mr. Nóbrega had the undoubted right under the Confrontation Clause of the Sixth Amendment to cross-examine witnesses who testified against him at the criminal trial—but Ms. Meerzon did not testify at his trial, and the Confrontation Clause does not extend to persons who do not testify at the trial and whose out-of-court statements are not admitted as evidence. *See Michigan v. Bryant*, 131 S. Ct. 1143, 1152-53 (2011) (tracing the history of the Confrontation Clause as an evidentiary rule). As the First Circuit pointed out, Ms. Meerzon did not testify at trial and none of her out-of-court statements was admitted as evidence at trial. *First Circuit J.* at 1-2. Therefore, Mr. Nóbrega did not have a constitutional right under the Confrontation Clause to question Ms. Meerzon at his trial.

Mr. Nóbrega had a right under the Sixth Amendment to compulsory process to compel Ms. Meerzon to appear at trial. U.S. CONST. amend VI; *Washington v.*

*Texas*, 388 U.S. 14, 18-19 (1967). However, her Fifth Amendment right to remain silent trumps his right to compel her testimony. *United States v. De La Cruz*, 996 F.2d 1307, 1312 (1st Cir. 1993). Once Ms. Meerzon stated that she would not testify on Fifth Amendment grounds, she became essentially unavailable as a witness either for the Government or for Mr. Nóbrega.[4] *See United States v. McKeeve*, 131 F.3d 1, 9 (1st Cir. 1997) (holding that "evidence properly within the former testimony hearsay exception [which requires that the witness be unavailable] is, by definition, not vulnerable to a challenge based upon the Confrontation Clause"); *United States v. Innamorati*, 996 F.2d 456, 474 (1st Cir. 1993) (holding that invocation of the Fifth Amendment renders a witness "unavailable" for the purpose of exceptions to the Rule Against Hearsay). The Court was so informed by the lawyers for both the Government and Mr. Nóbrega, and the Court accepted their representations.

During his trial, Mr. Nóbrega elected not to testify and the Court not only did not require him to do so, but instructed the jury that it could not hold his silence against him. Mr. Nóbrega's repeated complaint that Ms. Meerzon should have been called as a witness at his trial does not take into account that she has the same right to remain silent as he did.

---

[4] Ms. Meerzon might have been required to testify at Mr. Nóbrega's trial if the Government had granted her immunity from prosecution, but the Government expressly refused to do so. Whether a person receives prosecutorial immunity rests with the prosecutor, not the Court.

### C. Physical Evidence

Although Mr. Nóbrega says that if he were granted a new trial, he would produce certain physical evidence that would exonerate him, he does not describe that evidence. *Def.'s Mots.* at 2 ("I will also submit physical evidence that was hid from the Grand Jury and Trial Jury also you. Evidence that Mrs. V. Villa and James McCarthy hid from everyone so this outcome would happen"). Because the Court does not know what Mr. Nóbrega is referring to, it cannot assess whether this new evidence would warrant relief. *See* RULES GOVERNING § 2255 PROCEEDINGS 2(b)(2) (a motion for post-conviction relief must "state the facts supporting each ground [for relief]"); *see also, generally*, RULES GOVERNING § 2255 PROCEEDINGS.

### D. Prosecution of Norella Meerzon

Mr. Nóbrega is very upset that Norella Meerzon has never been prosecuted and he believes that if Ms. Meerzon had been charged, the indictment against him "would be no good." *Def.'s Mots.* at 3. Mr. Nóbrega is wrong in thinking that if Ms. Meerzon had illegally furnished him with a firearm, he could not be guilty of possessing it. *United States v. Fuller*, 768 F.2d 343, 346 (1st Cir. 1985). Even if the Government charged Ms. Meerzon with a firearms crime, this would not have exonerated Mr. Nóbrega from the charge that he possessed the firearm she furnished him.

He states that "[i]n reality, the Adverse Witness [Ms. Meerzon] should have been criminally charged with providing a prohibited person with a firearm after twice she orally admitted to doing so." *Def.'s Mots. at 3.* Mr. Nóbrega demands that the Court file criminal charges against Ms. Meerzon:

> [I]f you are a man of justice, like you claim to be. Then you will gra[]nt my 60(b) [motion and] re-hear this matter fix what is wrong *and above all file criminal charges on the Adverse Witness for providing a prohibited (known) person with a firearm.* That would be true justice.

*Id.* at 4 (emphasis supplied). The Court does not have the authority to file criminal charges against anyone.[5] U.S. CONST. art. III, § 2; *Wayte v. United States*, 470 U.S. 598, 607 (1985). "[United States Attorneys'] authority to prosecute, which dates back almost to the birth of the Republic . . . derives directly from Congress." *United States v. Flemmi,* 225 F.3d 78, 86 (1st Cir. 2000) (citing the Judiciary Act of 1789, 1 Stat. 73). Furthermore, "the power to prosecute plainly includes the power not to prosecute." *Id.* at 87. In other words, the decision to prosecute Ms. Meerzon—or not—rests exclusively in the hands of the United States Attorney, not the United States District Court.[6] This Court is unable to give Mr. Nóbrega this requested relief.

### E.     Final Thoughts

In his most recent letter, Mr. Nóbrega, writing to the Court, asserts "you do not care for me at all." *Def.'s Mot.* at 1. The Court regrets that Mr. Nóbrega feels this way. The Court is concerned about Mr. Nóbrega's well-being and wishes him well.

At the same time, the Court is duty-bound to respect the verdicts of federal juries. If the jury in Mr. Nóbrega's case had issued a not guilty verdict, the Court

---

[5]     Contempt of court, 18 U.S.C. § 401, is an exception to this rule, but it is not relevant here.
[6]     By separate cover, Mr. Nóbrega filed an extensive document with the Court, demanding that Ms. Meerzon be prosecuted. As the Court is not empowered to initiate prosecutions, it forwarded his papers to the United States Attorney for the District of Maine for such action as the federal prosecutor deems appropriate.

would have issued a judgment in his favor and released him. However, here, the jury found Mr. Nóbrega guilty as charged and it became this Court's obligation to sentence him in accordance with the verdict. The Court remains hopeful that Mr. Nóbrega will return to a happy, productive, peaceful and crime-free life upon his release from incarceration.

## III. CONCLUSION

The Court DENIES Domīngós Nóbrega's Motion for Post-Conviction Relief (ECF No. 276).

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 11th day of July, 2014