UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:10-cr-00186-JAW |
| | ) | |
| DOMINGÓS NÓBREGA | ) | |
| ———————————————— | ) | |
| DOMINGÓS NÓBREGA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:15-cv-00134-JAW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| ———————————————— | ) | |

**ORDER ON DOMINGÓS NÓBREGA'S MOTION TO PROFFER
UNCONDITIONAL DISCHARGE**

The Court rejects a defendant's demand for an unconditional discharge from
his conviction and sentence, including supervised release, because the statute upon
which the defendant relies, 12 U.S.C. § 95a(2), is void, and because a companion
statute, 50 U.S.C. § 4305(b)(2), does not provide a basis for the relief he is requesting.
Also, contrary to his argument, the federal court has jurisdiction over federal crimes
occurring within the state of Maine, including possession of a firearm by a felon, the
crime the defendant was convicted of violating. Lastly, the Court rejects his claim for
damages, as he has not been wrongfully incarcerated and as the statutes he cites in
support of his position, 26 U.S.C. §§ 7213 and 7431, provide relief to taxpayers whose

return information has been improperly disclosed, and do not provide a basis for his requested relief.

## I. BACKGROUND

### A. Procedural Background

On October 31, 2019, Domingós Nóbrega filed a pro se motion with the Court entitled, "Motion to Proffer Unconditional Discharge of 1:10-cr-000186-JAW-001 Through Settlement of Sum Certain Amount Held by Title 12 U.S.C. § 95(a)(2)." *See* (ECF No. 472) (*Mot. to Proffer*). At a hearing on the conditions of supervised release, Mr. Nóbrega raised the status of his motion and, as the Court's order dated October 31, 2019 describes, the Court informed Mr. Nóbrega that its practice when represented defendants file pro se motions is to allow the attorney who is representing the defendant to adopt, modify, or decline to adopt the pro se motion. *Preliminary Order on Domingós Nóbrega's Mot. to Proffer Unconditional Discharge* (ECF No. 473). On November 4, 2019, Attorney Jeffrey Silverstein filed a notice confirming that he was not adopting the pro se filing. *Defense Counsel's Notice of Intent not to Adopt Pro Se Filing: "Mot. to Proffer Unconditional Discharge of 1:10-CR-000186-JAWE-001 Through Settlement of Sum Certain Amount Held by Title 12 U.S.C. § 95(A)(2)." (ECF No. 472)* (ECF No. 475). After Attorney Silverstein's notice, the Government filed its response. *Gov't's Resp. to the Def.'s Mot. to Proffer Unconditional Discharge of 1:10-CR-00186-JAW-001 Through Settlement of Sum Certain Amount Held by Title 12 USC § 95(a)(2)* (ECF No. 477) (*Gov't's Resp.*). Mr. Nóbrega then made two filings with the Court. The first is a seventy-page document

without a title that the Clerk's Office received on November 14, 2019, which the Court docketed as his reply. *Reply to Resp. to Mot. to Proffer* (ECF No. 480) (*Def.'s Reply*); *Order on Recently-Received Doc.* (ECF No. 479). The next was entitled a motion to respond to Government docket number 477 that the Clerk's Office received on November 20, 2019, *Mot. to Respond to Govt Dkt No 477* (ECF No. 481) (*Def.'s Suppl. Reply*), and on November 25, 2019, the Court treated Mr. Nóbrega's most recent filing as a supplemental reply. *Order on Def.'s Mot. to Resp. to Gov't Docket No. 477* (ECF No. 482).

## B.     The Charge, Trial, and Sentence

On November 18, 2010, a federal grand jury indicted Domingós Nóbrega of possession of a firearm by a felon, a violation of 18 U.S.C. § 922(g)(1). *Indictment* (ECF No. 16). Jury trial began on May 23, 2011, *Min. Entry for Proceedings Held Before Judge John A. Woodcock, Jr.* (ECF No. 93), and on May 24, 2011, the jury issued a verdict, finding Mr. Nóbrega guilty as charged. *Jury Verdict Form* (ECF No. 98).

Trial testimony revealed that in October 2010, Mr. Nóbrega, who had previously been convicted of a felony, was staying in Bangor, Maine, with his girlfriend Norella Meerzon. During the months before October 2010, Mr. Nóbrega was in email communication with a friend by the name of Eric Babilonia. Mr. Babilonia became increasingly concerned about Mr. Nóbrega's emails and he let Ms. Meerzon know about Mr. Nóbrega's apparent instability. On October 23, 2010, Ms. Meerzon went to the Bangor Police and showed them email correspondence that Mr.

Babilonia had shared with her. Based on the email correspondence, the Bangor Police set up a tactical team around Mr. Nóbrega's home in Bangor. After repeatedly attempting to contact Mr. Nóbrega over the next four hours, the police teargassed the residence. Mr. Nóbrega emerged peacefully and the police arrested him.

During the hours the tactical team had the residence surrounded, Joel Nadeau, a Bangor Police Detective trained as a sniper, testified that he had the Nóbrega residence under surveillance with a high-powered scope and saw Mr. Nóbrega hold a semiautomatic handgun. Another Bangor Police Detective, Erik Tall, participated in the execution of a search warrant of the Nóbrega premises sometime just after midnight and found a 9-millimeter Glock pistol underneath the mattress in the master bedroom. Detective Nadeau identified the Glock that Detective Tall found as bearing a very close resemblance to the handgun he observed in Mr. Nóbrega's hand the evening before. *Tr. of Proceedings Vol. II* at 155:16-19 (ECF No. 137) (*Vol. II*). The Government called several other police officers who confirmed the events surrounding the tactical team's staking out of the Nobrega residence and his arrest.

In addition to the police officers, the Government called a number of lay witnesses. Mr. Babilonia confirmed that among other things Mr. Nóbrega had said that caused him to contact Ms. Meerzon was that he was "sitting next to his gun," and that he was "locked, cocked and ready to go, pretty much he had his guns, and he was suited up . . .." *Tr. of Proceedings Vol. I* at 21:22-23; 22:14-15 (ECF No. 136) (*Vol. I*).

During the days leading up to October 23, 2010, a group of friends from New York visited the Nóbrega-Meerzon residence. One was Crystal Schroeder. Ms. Schroeder arrived at the Bangor home on October 18th or 19th with Jason Rodriguez, Christopher Sherrill, and Justina Cipriano, and a woman named Olga. Ms. Schroeder testified that when she arrived at the Meerzon home, Mr. Nóbrega opened the door and was carrying a black handgun. *Id.* at 38:18-23. Ms. Schroeder said that she noticed the same firearm on the nightstand in Ms. Meerzon's and Mr. Nóbrega's bedroom. *Id.* at 39:10-12; 41:17-22. Finally, she testified that the evening before the New York friends left, when they sat down for dinner, Mr. Nóbrega got dressed up in a black bullet-proof vest, a robe, and a shoulder holster containing a gun. *Id.* at 39:7-43:12. Ms. Schroeder identified Exhibit 6, which was the Glock that Detectives Tall and Nadeau identified, as being the firearm that Mr. Nóbrega had in his holster. *Id.* at 42:16-43:12. Ms. Schroeder said that Mr. Nóbrega described the meal as the "Last Supper" and during the meal, he brought out a Bible and had Ms. Schroeder read a passage about betrayal. *Id.* at 41:7-12.

Christopher Sherrill also testified. He arrived in Bangor with Justina Cipriano, Crystal Schroeder, Jason Rodriguez, and Olga. He confirmed that he had seen a handgun in the master bedroom on a nightstand. *Id.* at 55:20-56:4. Mr. Sherrill testified that when he and Justina Cipriano were in one of the bedrooms, Mr. Nóbrega entered wearing a black shoulder holster with a gun. *Id.* at 57:4-21. Mr. Sherrill later saw the holster through the white robe Mr. Nóbrega was wearing that evening. *Id.* at 58:3-14. He confirmed that Mr. Nóbrega called the dinner the "Last

Supper." *Id.* at 58:15-18. Mr. Sherrill testified that Mr. Nóbrega told him that he had the gun in order to protect himself from Jason Rodriguez, who he thought was a police officer. *Id.* at 59:25-60:6. Mr. Sherrill identified Exhibit 6 as appearing to be the same firearm that he saw on the nightstand in the master bedroom. *Id.* at 60:16-24.

Justina Cipriano testified. She corroborated Mr. Sherrill's testimony about Mr. Nóbrega coming into their bedroom with a gun and a vest. *Id.* at 68:2-9. She also was "pretty sure" he was playing with the firearm, cocking it. *Id.* at 69:9-13. Similarly, she identified Exhibit 6 as appearing like the gun Mr. Nóbrega had in the bedroom. *Id.* at 68:25-69:3.

Jason Rodriguez testified. Mr. Rodriguez is a sound technician who met Mr. Nóbrega in the music business in New York, and they had developed a "working relationship." *Id.* at 73:3-4, 73:9-74:8. Mr. Rodriguez testified that while they were in New York, Mr. Nóbrega had told him he had a gun and that Mr. Rodriguez had witnessed him with one. *Id.* at 75:9-17. When Mr. Rodriguez arrived in Maine to visit Ms. Meerzon and Mr. Nóbrega, Mr. Rodriguez did not see Mr. Nóbrega with a firearm, but he confirmed details about the so-called "Last Supper," including Mr. Nóbrega's white robe and Bible readings. *Id.* at 79:14-80:14.

The Government also called April Renee Maness as a witness. She has known Mr. Nóbrega since she was 12 or 13 years old. *Vol. II* at 138:11-14. She said that on October 23, 2010, he began texting her about having "some kind of a crisis." *Id.* at 139:2-6. He thought his girlfriend was having him followed by the FBI. *Id.* at 139:6-

9. He told Ms. Maness that "he wasn't going down without a fight and he was packed." *Id.* at 139:22-23.

Mr. Nóbrega did not testify. *Id.* at 223:2-225:4. The defense called one witness, an investigator, who provided foundational evidence for the admission of a deed, which confirmed that Ms. Meerzon and Mr. Nóbrega both owned the house where this incident took place, that a number of liens and mortgages had been filed against the premises, and that Ms. Meerzon was suing Mr. Nóbrega civilly. *Id.* 226:21-237:23.

On July 13, 2012, the Court sentenced Mr. Nóbrega to 120 months of incarceration, three years of supervised release, and a $100 special assessment. *J.* (ECF No. 228). The Court did not fine Mr. Nóbrega. *Id.*

On July 25, 2012, Mr. Nóbrega appealed the judgment. *Notice of Appeal* (ECF Nos. 232, 233). The First Circuit dismissed the appeal on August 22, 2012 for lack of diligent prosecution. *J.* (ECF No. 237).

## II. THE PARTIES' POSITIONS

### A. Overview

The Court observed previously that Mr. Nóbrega has "never accepted the verdict and sentence and has pursued all conceivable avenues of relief . . .." *Order on Def.'s Mots. for New Trial and New Sentencing* at 5 (ECF No. 281) (*Second New Trial Order*). He filed numerous post-judgment motions that have resulted in numerous court orders. *See Order on Mot. for New Trial* (ECF No. 157); *Order on Def.'s Mots.* (ECF No. 244); *Order Granting Mot. to Construe Rule 60(b) Mot. as a Mot. Pursuant to Section 2255* (ECF No. 266); *Recommended Decision on Rule 60(b) Mot. and Mot.*

*to Construe Rule 60(b) Mot. as a 28 U.S.C. § 2255 Mot.* (ECF No. 267); *Order Affirming the Recommended Decision of the Magistrate Judge* (ECF No. 270); *Order Staying Mot. for Post-Conviction Relief* (ECF No. 278); *Second New Trial Order; Order on Grand Jury Mots.* (ECF No. 320); *Order on Mot. for Recons. of Order on Grand Jury Mots.* (ECF No. 341); *Am. Further Order on Mot. for Recons. of Order on Grand Jury Mots.* (ECF No. 351); *Order on Def.'s Mot. Concerning the Warden's Mail Practices* (ECF No. 357); *Order on Mot. for Relief from Stay* (ECF No. 358); *Order on Mot. to Compel U.S. Gov't to Produce Ct. Record of Invoke/Assert* (ECF No. 362); *Recommended Decision on 28 U.S.C. § 2255 Mot.* (ECF No. 369); *Order Affirming Recommended Decision on 28 U.S.C. § 2255 Mot.* (ECF No. 397); *Order on Def.'s Mot. to Hear, Correct, Update, Change PSI & Adopt[] New Finding & Change Probation Office to N.Y. & Mot. to Sever & Aff.* (ECF No. 399); *Order on Def.'s Obj. and Mot. for Recons.* (ECF No. 401); *Order on Mot. to Recons. Order Affirming Recommended Decision on 28 U.S.C. § 2255 Mot.* (ECF No. 403); *Order Affirming Recommended Decision on 28 U.S.C. § 2255 Mot.* (ECF No. 420). Mr. Nóbrega has now been released from incarceration and is serving the three-year period of supervised release. *See Req. for Summons and Modification of the Conditions or Term of Supervised Release* (ECF No. 428).

## B.     Domingós Nóbrega's Settlement of Sum Certain Motion

On October 31, 2019, Mr. Nóbrega filed a four-page document with the Court entitled "Motion to Proffer Unconditional Discharge of 1:10-cr-000186-JAW-001 Through Settlement of Sum Certain Amount Held by Title 12 U.S.C. § 95(a)(2)." *Mot.*

*to Proffer*. In the motion, Mr. Nóbrega says that he is "trying to ACCEPT Responsibility of 1:10-cr-000186-JAW-001 & hereby Seeks to zero out the Remainder CUM CERTAIN AMOUNT in the above-stated matter." *Id.* at 1. Citing 12 U.S.C. § 95(a)(2), Mr. Nóbrega requests the Court "for the Remaining SUM CERTAIN AMOUNT &/or Subscription Contract Remaining in this Case/Matter to Zero-out the Balance as the 'Point of Authority' of Law (12 U.S.C. § 95(a)(2)) stated above." *Id.* at 2. Mr. Nóbrega writes that "[t]he Petitioner & nóbrega § 1-308 would like to Settle/zero-out the accounting ledger/business records of the Clerk of Court of this matter today & an full unconditional discharge of this case & supervised release." *Id.* at 3.

To this motion, Mr. Nóbrega attached a "NOTICE OF APP[O]INTMENT SPECIAL DEPOSIT" directed to the Assistant United States Attorney (AUSA) Joel Casey now assigned to his case. *Id.* Attach. 1, *Notice of App[o]intment Special Deposit*. In this notice, Mr. Nóbrega returns "legal title" to AUSA Casey and grants him "such issue required to settle all liability of the defendant." *Id.*

Mr. Nóbrega also attached an offer to this Judge "for settlement." *Id.* Attach. 2, *Offer by Title 12 U.S.C. §95(a)(2)*. In this notice, Mr. Nóbrega again asks to "Zero-out the SUM CERTAIN AMOUNT by CONVEYING (Dkt # 429) the AFFIDAVIT-Clause 41 BILL OF LADING over to Off-Set & Zero-out the remaining Balance

Equally in this matter. For full unconditional Discharge of 186-JAW-1." *Id.* at 1. Mr. Nóbrega asks:

> Now does this Court Trustee Honor or Dishonor this Offer of Settlement to Zero the remaining SUM CERTAIN AMOUNT balance? Held by Title 12 U.S.C. § 95(a)(2).

*Id.*

Mr. Nóbrega's reference to "(Dkt # 429) the AFFIDAVIT- Clause 41" must be a reference to an affidavit attached by Mr. Nóbrega to an August 15, 2019, filing entitled "Affidavit of Presentment." *Aff. of Presentment*, Attach. 1, *Aff. of Non-Consent to Participate in Imprisonment & Three Years Supervised Release Notice of Exhaustion of Private International Administration Process Demand* (ECF No. 429) (*Aff. of Non-Consent*). In numbered paragraph 41 of the Affidavit of Non-Consent, Mr. Nóbrega writes:

> That, whereas ANY Act (of the further ACTS) which may cause an illegal detention, arrest, seizure, incarceration or physical harm to Affiant (or Mental) herein is assigned to Minimum M[o]nitary Value as per precedent established by, <u>TREZEVANT -v- CITY OF TAMPA</u>, 741 D. 2x 336; $25,000.00 per 23 minutes period, i.e., $65,217.91 per hour, & $1,556,218.30 per day, plus punitive damages in the amount decided by Affiant's hears or assigns. On COUNT ONE, ON COUNT TWO, & COUNT THREE, demand is hereby made to exhibit to the Affiant NO later than deadline, a copy of form 2848, 8821, a Contract or other written Authorization bearing Affiant's Signature which provides Affiant's expressed Authorization to discloseConfidential Information, or the Constitution provision which Authorizes same, subject him to public scorn & ridicule, violate Affiant's privacy, & publish false information is violation, absent such exhibition, demand is hereby made for immediate payment to the Affiant, of civil penalty pursuant to 26usc §7431 in the Sum Certain of Eight Hundred Eighty Five Million Four Hundred Thousand Dollars, fiat money, &/or U.S. Dollars ($3,541,600,000.00) which represents Civil damages subjected to a compensatory damages multiplier of four (4x); punitive damages in the Sum Certained at One Hundred Seven Billion Eighty Million in Silver Dollars, fiat money &/or U.S. Dollars ($107,080,000,000.00) which

represents compensatory damages subject to a punitive damage multiplier of TWO hundred (200x); Criminal fine for Felony disclosure pursuant to 26usc §7213 of Five Thousand Dollars($5,000.00); imprisonment for five years, & removal from Office (Affiant has served 9yrs incarcerated);

Failure to respond will constitute the lackof existence of valid Contract knowingly, willingly, voluntarily, intelligently & intentionally, with FULL disclosure signed by Affiant Consenting to participate in a term of 10 years (120 months) Imprisonment & 3yrs Supervised Release, representing the Corporation: DOMINGOS NOBREGA, as NAMED in Judgment & Commitment Order No.: 1:10-cr-00186-JAW-1, UNITED STATES DISTRICT COURT OF BANGOR MAINE. Thus, makingrespondents liable as operation of Law if ANY attempted enforcement or execution is made, by admission of the respondents tacit procuration to the Statements & Facts provided above. Said Statement & Facts shall be deemed STARE DECISIS. "PERSON dealing with the GOVT. are Charged with knowing GOVT. status & regulations, & they assume the task that GOVT. Agents may exceed their Authority & provide misinformation". RAMIREZ DE ARELLANO -v- WEINBERGER, 745 F.3d 1500, 1523 (D.C. Cir. 1984); "An unlawful or unauthorized exercise of power does NOT become legitimate or Authorized by reason of habitude".

*Id.* ¶ 41.

## C. The Government's Response

On November 6, 2019, the Government filed a response. *Gov't's Resp.* In its response, the Government first argues that because Mr. Nóbrega appealed the Court's order in which it affirmed a condition of supervised release, the Court was without jurisdiction to rule on Mr. Nóbrega's motion. *Id.* at 2-3. The Government next argues that 12 U.S.C. § 95(a)(2) (actually § 95a(2)) does not provide the Court with any authority to discharge his case and supervised release. *Id.* at 3-6.

### D. Domingós Nóbrega's November 14, 2019 Reply

On November 14, 2019, Mr. Nóbrega filed with the Court a seventy-page series of documents. *Def.'s Reply*. On November 18, 2019, the Court ordered the Clerk of Court's Office to treat this filing as a reply to the Government's response since the document refers the docket number in this case and to his motion for unconditional discharge. *Order on Recently-Received Doc.* (ECF No. 479). Even so, Mr. Nóbrega's filing is not organized in a coherent way and the Court finds it difficult to understand his claims. As best the Court can interpret them, the documents declare Mr. Nóbrega to be a sovereign citizen, renounce his American citizenship, distinguish between his birth name, Shawn Alan Nóbrega, and his preferred name, Sir Domingós Nóbrega, and contain various legal documents, such as a security agreement and a "last divine will & personal testament," that purport to establish that he is not subject to the jurisdiction of this Court. *Def.'s Reply* at 1-70. For example, in a document entitled, "Declaration of Standing, Political Status, & Estate Interest," Mr. Nóbrega writes:

> I, a living Earthling free born on the land of the MASSACHUSETTS STATE, one of the STATES OF AMERICA having reached the age of majority, being of sound mind & body, not destitute or otherwise acting under duress or inability, hereby declare my Political Status to be that of "one of the free Sovereign & independent people of the UNITED STATES", & not an "inhabitant" as both are described by The Definitive Treaty of Peace, Paris, 1783.

*Id.* at 24. In another document, entitled "Act of Expatr[i]ation, Declaration and Allegiance," Mr. Nóbrega formally renounces United States citizenship. *Id.* at 36.

### E.    Domingós Nóbrega's November 20, 2019 Supplemental Reply

On November 25, 2019, Mr. Nóbrega filed with the Court a motion to respond together with forty-seven pages of attachments. *Def.'s Suppl. Reply*. The Court granted the motion on November 25, 2019 and treated the document and its attachments as a supplemental reply to the Government's response. *Order on Def.'s Mot. to Resp. to Gov't Docket No. 477* (ECF No. 482). In the attached documents, Mr. Nóbrega includes his claim for approximately $110 billion dollars, *id.*, Attach. 1 at 11, and he argues that title 18 of the United States Code is applicable only to Guam, the Mariana Islands, and the Virgin Island, and not to events occurring in one of the states of the United States. *Id.* at 14-15. The second attachment of thirty pages contains a series of documents consistent with Mr. Nóbrega's contention that this Court has no jurisdiction over him because he is not a United States citizen and is instead a sovereign citizen. *Id.*, Attach. 2 at 1-30.

## III.   DISCUSSION

### A.    November 27, 2019 Remand

Preliminarily, the Court rejects the Government's contention that the Court has no jurisdiction over Mr. Nóbrega's motion because he filed an appeal to the Court of Appeals for the First Circuit of the Court's October 10, 2019, order granting the Probation Office's request to modify the terms of his supervised release. After the Government's November 6, 2019, response, on November 27, 2019, the First Circuit dismissed Mr. Nóbrega's appeal upon his motion and issued a mandate, returning

13

full jurisdiction to this Court. *J. of the Ct. of Appeals for the First Circuit* (ECF No. 483); *Mandate of the Ct. of Appeals for the First Circuit* (ECF No. 484).

### B. Domingós Nóbrega's Argument Under 12 U.S.C. § 95a(2)

The Court turns to Mr. Nóbrega's main argument. As the Court understands it, Mr. Nóbrega's basic contention is that 12 U.S.C. § 95a[1] allows him to obtain an unconditional discharge of his criminal case, including the three-year period of supervised release, simply by offering to zero-out a sum certain. The Court does not read the law the way Mr. Nóbrega reads it.

First, the statute that Mr. Nóbrega relies upon, § 95a, is "no longer valid." *United States v. McLaughlin*, No. 3:17-cr-129 (MPS), 2018 U.S. Dist. LEXIS 172433, at *45 (D. Conn. Oct. 5. 2018); *see also Schlabach v. United States*, No. 2:18-cv-00053-SMJ, 2019 U.S. Dist. LEXIS 49495, at *19 (D. Wash. Mar. 25, 2019) ("[T]his statute no longer exists and otherwise does not apply in this context"); *Taylor v. United States*, No. 2:18-cv-11185, 2018 U.S. Dist. LEXIS 153589, at *10 (E.D. Mich. Sept. 10, 2018). Congress omitted § 95a from the United States Code effective December 1, 2015, because "an identical section exists in 50 U.S.C. § 4305(b)(2) and has since 1941." *Walquist v. Comm'r of Revenue*, No. 08890-R, 2016 Minn. Tax LEXIS 23, at *6 n.28 (Minn. Tax Ct. May 11, 2016).

Second, assuming Mr. Nóbrega would assert that the same language in 50 U.S.C. § 4305(b)(2) provides a basis for his motion, the statute appears in title 50,

---

[1]      The Government correctly points out that the language Mr. Nóbrega quotes in his motion is found in § 95a(2), not § 95(a)(2).

which is the part of the United States Code that addresses war and national defense, specifically trading with the enemy.  Section 4305(b)(2) reads:

> Any payment, conveyance, transfer, assignment, or delivery of property or interest therein, made to or for the account of the United States, or as otherwise directed, pursuant to this subdivision, or any rule, regulation, instruction, or direction issued hereunder shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same; and no person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder.

50 U.S.C. § 4305(b)(2).  On its face, the subsection does not address criminal prosecutions for firearms offenses.

Second, as its heading implies, § 4305 addresses "Suspension of provisions relating to ally of enemy; regulation of transactions in foreign exchange of gold or silver, property transfers, vested interests, enforcement and penalties."  There is no suggestion that Congress enacted § 4305 (or for that matter § 95a) to provide a person convicted of the federal crime of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) with a means to discharge, settle, zero-out or annul his conviction and sentence.

Third, § 4305 by its terms applies when the President finds it "compatible with the safety of the United States and with the successful prosecution of the war," and the United States is not currently at war.[2]  § 4305(a).  "Even before it was omitted,

---

[2]    Section 95a, when it was effective, was more restrictive.  By its terms it applied "[d]uring a time of war." If it were not invalid, § 95a would not apply because the United States is not currently in a "time of war."  The language Mr. Nóbrega relies upon, the "full acquittance and discharge" phrase, first appeared in the statute in 1917, when Congress enacted the "Trading with the Enemy Act."  *See An Act to Define, Regulate, and Punish Trading with the Enemy, and for other purposes*, 65 P.L. 91, 40

however, the statute related to the President's authority to regulate transactions involving foreign parties during times of war." *Harrington v. Sterling (In re Sterling)*, 558 B.R. 671, 682 (Bankr. S.D.N.Y. 2016). Congress originally enacted § 4305 in 1917, the same year the United States entered World War I, and it was known as the "Trading with the enemy Act." Trading with the Enemy Act, Pub. L. No. 65, § 91, 40 Stat. 411, (1917). The language, "full acquittance and discharge," which Mr. Nóbrega relies upon, appears in subsection 7(e) of that Act. Congress amended the Trading with the Enemy Act in 1933 in response to the banking crisis during the Great Depression, and it expanded the authority of the President to include actions not only during a "time of war," but also "during any other period of national emergency declared by the President." Pub. L. No. 73, § 1, § 2(b), 48 Stat. 1 (1933). On December 18, 1941, just weeks after the Pearl Harbor attack, Congress amended the Trading with the Enemy Act to include its current language. Pub. L. 77, § 354, § 301(1)(B)(2), 55 Stat. 838 (1941). In 1977, Congress eliminated the statutory language, "or during any other period of national emergency declared by the President," leaving the "compatible with safety" and "successful prosecution of the war" language. Pub. L.

---

Stat. 411, § 7(e), 65 Cong. Ch. 106 (Oct. 6, 1917). It was on December 18, 1941, in the immediate aftermath of the attack on Pearl Harbor that Congress enacted the current language of subsection 2 as part of the First War Powers Act. 55 Stat. 839, ch. 593, Title III, § 301, (Dec. 18, 1941). The statute deals generally with the import and export of gold and silver bullion. *See United States v. Lester*, 328 F.2d 971 (2d Cir. 1964). The Second Circuit referred to § 95a as part of the Gold Act. *United States v. Lieblich*, 246 F.2d 890, 892 (2d Cir. 1957).

As originally enacted, the statute also applied during a period of national emergency as declared by the President. *See Pike v. United States*, 340 F.2d 487 (9th Cir. 1965). But in 1977, Congress deleted this language, leaving only the "time of war" language in the current version of the statute. 55 Stat. 838, Act Dec. 28, 1977, P.L. 95-223, Title I, §§ 101(a), 102, 103(b).

In any event, when it was effective, § 95a had nothing to do with Mr. Nóbrega's case.

95, § 223, 91 Stat. 1625 (1977). As this legislative history confirms, § 4305 is not about acquitting individuals who have been convicted of federal crimes.

The bottom line is that neither § 95a(2) nor § 4305(b)(2) provides authority for this Court to approve Mr. Nóbrega's attempt to undo his criminal conviction and sentence.

### C.     The Territorial Reach of the Uniform Criminal Code

In his supplemental response, Mr. Nóbrega cites 18 U.S.C. § 23 for the proposition that title 18 only applies to Guam, the Mariana Islands, and the Virgin Islands and not to actions undertaken within the states of the United States. Even though this issue is technically not before the Court because it appears for the first time in Mr. Nóbrega's reply, *see* D. ME. LOC. R. 7(c), the Court addresses it because a party is able to raise jurisdictional questions at any time.

This statute reads:

> As used in this title, except where otherwise expressly provided the term "court of the United States" includes the District Court of Guam, the District Court for the Northern Mariana Islands, and the District Court of the Virgin Islands.

18 U.S.C. § 23. Mr. Nóbrega interprets this language to mean that the United States District Courts do not have jurisdiction over crimes committed within the United States of America – other than Guam, the Northern Mariana Islands and the Virgin Islands.

He is mistaken. It would of course be remarkable if the United States Constitution created the judicial branch of government and Congress enacted an elaborate federal criminal code, only to have Congress restrict the district courts with

jurisdiction over federal crimes to the district courts of Guam, the Northern Mariana Islands, and the Virgin Islands. It is true that § 23 provides that "court of the United States" includes the district courts of Guam, the Northern Mariana Islands, and the Virgin Islands. But the statute does not exclude from the definition of "court of the United States" the other United States district courts in the judicial districts within the United States.

Another provision provides jurisdiction to this Court and the other district courts over federal criminal matters. Section 3231 of title 18 provides:

> The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

This act gives the United States District Court of Maine jurisdiction over violations of federal firearms law occurring in the state of Maine. *See United States v. Gaines*, 515 Fed. Appx. 151, 154 n.7 (3d Cir. Mar. 13, 2013).

### D. Domingós Nóbrega's Request for Damages

In his request for damages, Mr. Nóbrega references three authorities. The first is *Trezevant v. City of Tampa*, 741 F.2d 336 (11th Cir. 1984). In that case, the plaintiff was wrongfully incarcerated for twenty-three minutes, and a jury awarded him $25,000 in damages. *Id.* at 338. Mr. Nóbrega uses the damages award in this case as a benchmark for his calculation of his own claim for damages. *Aff. of Non-Consent* ¶ 41. Other courts have responded to similar citations to *Trezevant*. *See, e.g. Osorio v. Connecticut*, No. 3:17-CV-1210 (CSH), 2018 WL 1440178, at *4 (D. Conn. Mar. 22, 2018); *McLaughlin v. Barron*, No. 13 Civ. 0807 (NSR) (PED), 2018 WL 1872535, at

*1 (S.D.N.Y. Jan. 24, 2018); *Dolphin v. Ruiz*, No. CV 07-0645-PA (JTL), 2008 WL 4552940, at *4-5 (C.D. Cal. Oct. 9, 2008).

*Trezevant* is inapposite. Unlike *Trezevant*, despite Mr. Nóbrega's belief to the contrary, Mr. Nóbrega has not been wrongfully incarcerated. Mr. Nóbrega was indicted by a federal grand jury; he was represented throughout the process by appointed counsel; he requested and received a jury trial; he participated in jury selection in accordance with the rules of court; at the trial, his counsel cross-examined Government witnesses and presented a witness on his behalf; he was given the opportunity to testify on his own behalf and asserted his Fifth Amendment right to remain silent, and the Court instructed the jury not to hold his silence against him; and his attorney gave an opening statement, a closing argument, and she had the right to object to evidence the Government offered and to participate in the formulation of jury instructions. At the close of the case, the jury deliberated and found Mr. Nóbrega guilty as charged. After the sentencing hearing, Mr. Nóbrega was given the opportunity to appeal. He was accorded the right to challenge the legal sufficiency of his conviction and sentence in post-conviction proceedings. Whatever his private beliefs, under the law, Mr. Nóbrega is not considered either wrongfully convicted or wrongfully incarcerated. He has received all the process that the law dictates was due to him and the Court must accept his conviction as valid as a matter of law.

Mr. Nóbrega also appears to base his damages claim on two statutes: 26 U.S.C. § 7431 and 26 U.S.C. § 7213. *Aff. of Presentment*, Attach. 1, *Aff. of Non-Consent to*

*Participate in Imprisonment & Three Years Supervised Release Notice of Exhaustion of Private International Administration Process Demand* ¶ 41. Both statutes are in the Internal Revenue Code and deal with the unauthorized inspection or disclosure of information from a taxpayer's tax return. 26 U.S.C. § 7431 is entitled "Civil damages for unauthorized inspection or disclosure of returns and return information." Mr. Nóbrega does not cite a particular subsection, but the Court assumes that he is referring to subsection (a)(1):

> If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

*Id.* § 7431(a)(1). Similarly, § 7213 is entitled "Unauthorized disclosure of information." Mr. Nóbrega again does not cite a particular subsection, but the Court infers that he is referring to subsection (a)(1):

> It shall be unlawful for any officer or employee of the United States or any person described in section 6103(n) (or an officer or employee of any such person), or any former officer or employee, willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)). Any violation of this paragraph shall be a felony punishable upon conviction by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution, and if such offense is committed by any officer or employee of the United States, he shall, in addition to any other punishment, be dismissed from office or discharged from employment upon conviction for such offense.

*Id.* § 7213(a)(1). Both subsections refer to the definition of "return" and "return information" located in 26 U.S.C. § 6103(b). Section 6103(b)(1) defines a "return" as:

> any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with

respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

Additionally, section 6103(b)(2) defines "return information" as:

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

(B) any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110(b)) which is not open to public inspection under section 6110,

(C) any advance pricing agreement entered into by a taxpayer and the Secretary and any background information related to such agreement or any application for an advance pricing agreement, and

(D) any agreement under section 7121, and any similar agreement, and any background information related to such an agreement or request for such an agreement,

but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer. Nothing in the preceding sentence, or in any other provision of law, shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws.

After reviewing these statutes, the Court concludes that they are not applicable here. The Court has not accessed any of Mr. Nóbrega's tax return information, let alone disclosed it, and Mr. Nóbrega does not allege otherwise. Rather, Mr. Nóbrega's demand seems based on the Court's supposed disclosure of

unspecified "Confidential Information" as well as the Court having subjected him "to public scorn & ridicule, violate[d] Affiant's privacy, & publish[ed] false information" about him. *Aff. of Presentment* ¶ 41.

The purpose of these statutes is not to provide formerly incarcerated individuals with a private cause of action for supposed harm caused to them by the lawful release of information about them on public dockets, but to provide a cause of action to taxpayers whose tax information is intentionally or negligently disclosed. *See Americans for Prosperity Found. V. Becerra*, 903 F.3d 1000, 1017 n.10 (9th Cir. 2018) (citing § 7213 for the proposition that "federal law imposes criminal penalties for unauthorized disclosure of information on tax returns"); *Niemela v. United States*, 995 F.2d 1061, at *4 (1st Cir. 1993) (unpublished table decision) (stating that "[u]nder 26 U.S.C. § 7431, a taxpayer may recover damages for the intentional or negligent disclosure of return information in violation of § 6103"). Indeed, the Court is constrained by First Circuit law to make public information on which it relies in reaching a disposition in a criminal case, with few exceptions that are not applicable here. *See United States v. Kravetz*, 706 F.2d 47, 52-54 (1st Cir. 2013) (defining "judicial records" as "materials on which a court relies in determining the litigants' substantive rights" and holding that once a document is deemed a judicial record, a common law right of public access attaches to it and it becomes presumptively public). These statutes do not provide Mr. Nóbrega with any cause of action or claim for damages.

### E. Sovereign Citizen

Although not directly raised by Mr. Nóbrega, the Government wonders whether Mr. Nóbrega believes he is a sovereign citizen and whether he contends that the laws of the United States do not apply to him because of his sovereign status. The Government is correct that some of Mr. Nóbrega's language is reminiscent of the legal claims of sovereign citizens. But the Court will not address this issue because, if he is asserting that he is a sovereign citizen, Mr. Nóbrega has not requested any relief based on this contention. To the contrary, Mr. Nóbrega appears to be complying with the terms of supervised release, which the Court finds encouraging, and the Court will not address an issue not before it.

## IV. CONCLUSION

The Court DENIES Domingós Nóbrega's Motion to Proffer Unconditional Discharge of 1:10-cr-000186-JAW-001 Through Settlement of Sum Certain Amount Held by Title 12 U.S.C. § 95(a)(2) (ECF No. 472).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of December, 2019